UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEUROLOGICAL SURGERY PRACTICE OF LONG ISLAND, PLLC;<br><br>Plaintiff,<br>v.<br><br>ELEVANCE HEALTH, INC., doing business as ANTHEM BLUE CROSS AND BLUE SHIELD OF NEW YORK; ANTHEM HEALTHCHOICE ASSURANCE, INC.; and ANTHEM HEALTHCHOICE HMO, INC.,<br><br>Defendants. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Case No. 26-cv-_______________ |

Plaintiff, Neurological Surgery Practice of Long Island, PLLC, by its attorneys, Harris Beach Murtha Cullina, PLLC, alleges for its Complaint against the Defendants, Elevance Health, Inc., doing business as Anthem Blue Cross and Blue Shield of New York; Anthem HealthChoice Assurance, Inc.; and Anthem HealthChoice HMO, Inc. (collectively, "Anthem"), as follows:

## PRELIMINARY STATEMENT

1. Effective July 1, 2026, Anthem has a commercial facility administrative policy in New York that imposes a 7.5% administrative penalty reduction on reimbursement to its network hospitals and ambulatory surgery centers that permit out-of-network clinicians – surgeons, anesthesiologists, radiologists, and some ER physicians – to provide services to its enrollees. As explained below, out-of-network clinicians are physicians and other providers who are not parties to a participating provider agreement with Anthem.

2. Anthem's proposed policy – entitled "*Use of a Nonparticipating Care Provider*" – further threatens hospitals with potential termination from Anthem's networks if the hospitals continue to rely on non-participating clinicians to render care.

3. Plaintiff Neurological Surgery Practice of Long Island PLLC is a non-participating physician practice that, as we explain below, is directly, negatively, and irreparably harmed by Anthem's actions.

4. By Anthem's own words and actions, these out-of-network clinicians are the express targets of Anthem's new policy. According to Anthem, it is adopting to protect its enrollees from the higher bills associated with out-of-network care. But Congress enacted – and President Trump signed into law – the No Surprises Act in late 2020. The NSA applies to the exact set of circumstances governed by the policy: out-of-network physician services rendered at in-network hospitals. It protects patients by prohibiting out-of-network providers from directly balance billing patients for their services.

5. In return, the NSA established an Independent Dispute Resolution ("IDR") process in which certified IDR entities, selected by the federal government, determine the appropriate level of reimbursement for out-of-network services provided at in-network hospitals. This process has been in place since January 2022.

6. Anthem believes that the IDR process is yielding inappropriately high reimbursement rates, which justifies their implementation of the policy. But the IDR determinations are binding statutory payment determinations reached after consideration of market-relevant statutory factors, including the QPA, patient acuity, complexity, training, experience, market share, and other information Congress directed IDR entities to consider. Courts have rejected agency efforts to convert the QPA into a presumptive benchmark. Anthem's policy is designed to bypass that federal process and use facility-level coercion to make IDR practically unavailable.

7. Anthem persists in implementing this policy notwithstanding that health care provider trade associations are almost universal in their vehement opposition to the policy.

8. Organizations with such wildly diverse interests as the American Hospital Association, the American Medical Association, the Connecticut State Medical Society, the American Association of Orthopaedic Surgeons, the American College of Obstetricians and Gynecologists, the American Osteopathic Association, the American Psychiatric Association, the American Society of Plastic Surgeons, the Medical Group Management Association, the Congress of Neurological Surgeons, the American College of Cardiology, the American Society of Anesthesiologists, the American College of Radiology, and the American College of Emergency Physicians have publicly opposed Anthem's actions.

9. For example, the Medical Society of the State of New York is New York's principal non-profit professional organization for physicians, residents, and medical students of all specialties. It has a stated mission to represent the interests of patients and physicians to assure quality healthcare services for all.

10. On April 7, 2026, the Medical Society of the State of New York, through its President, Mark James Adams, MD, MBA, issued a Statement entitled "*Physicians Call of Anthem/Elevance to Withdraw Policy Limiting Physician Availability at Hospitals Across New York State.*" (https://www.mssny.org/physicians-call-on-anthem-elevance-to-withdraw-policy/) (accessed Apr. 20, 2026).

11. In this Statement, the Medical Society warned: "It is outrageous that Anthem/Elevance is planning to penalize hospitals with steep financial penalties unless every single physician associated with that hospital is in the plan's network. The policy will significantly harm patient access to often-urgently needed care by limiting physicians available

at hospitals to deliver care, and by harming the many financially stressed hospitals across our state."

12. The Medical Society went on to state that the "end result of this short-sighted policy will be further consolidation in our healthcare system, and/or reduced patient access to immediately needed care at our hospitals across the State, including in already overstressed emergency departments. Our policymakers must step in to make sure it is not permitted to go forward before patient access to care is harmed."

13. Likewise, the American Hospital Association is the national organization that represents and serves all types of hospitals, health care networks, and their patients and communities. Nearly 5,000 hospitals, health care systems, networks, other providers of care and 43,000 individual members come together to form the Association.

14. Regarding Anthem's policy, the American Hospital Association has stated "**Anthem's approach would limit patients' choice of providers and could even mislead them about where they can access care.** If Anthem fails to secure adequate physician coverage for an in-network hospital, enrollees' access to the care presented to them as in-network options could be rendered largely meaningless. This is because in attempting to comply with the policy, the hospital may be forced to forgo providing needed care to Anthem enrollees when there are gaps in the plan's provider network. Thus, the hospital would appear available to patients as an in-network provider, but they could not effectively use their health plan benefits at that facility" (https://www.aha.org/lettercomment/2025-12-17-aha-urges-elevance-health-rescind-anthems-nonparticipating-provider-policy) (accessed Apr. 20, 2026).

15. The American Hospital Association goes on to explain that "Anthem's policy is fundamentally unworkable for hospital operations. The policy will require hospitals to verify in

advance the network status of every provider involved in a patient's care, a task made impossible by the current state of Anthem's provider directories. Major gaps and errors in provider directories are well documented and routinely confuse patients, providers and even the insurers themselves about who is in-network. Further, the policy fails to consider the very real challenges of hospital staffing shortages, the independent status of most provider groups and basic clinical coverage requirements hospitals must meet."

16. The American Hospital Association ends its statement by calling on "**Elevance Health to do right by its Anthem enrollees and ensure it is a credible partner to its network hospitals and health systems and rescind this deeply flawed policy.**"

17. The broad opposition to Anthem's policy is not surprising. Considering Anthem's market size, as well as federal and state requirements compelling hospitals to treat all patients who seek treatment, regardless of health coverage, it is virtually essential for New York hospitals and ambulatory surgery centers to remain in network for Anthem-affiliated health plans.

18. Given the thin margins at most hospitals in the current environment, they can little afford and will not accept a 7.5% reduction in reimbursement – and potential expulsion from Anthem's network – just so they can continue allowing out-of-network clinicians to provide services at their facilities.

19. Accordingly, if Anthem implements its policy, hospital and ambulatory surgery centers, notwithstanding their opposition, will follow it by employing strategies designed to force out-of-network providers on their medical staff to either obtain an Anthem participating provider contract or lose their ability to provide any services at the facilities.

20. Since many physician specialties absolutely require hospital access to provide services and remain economically viable, this puts Anthem into the role of necessary gatekeeper:

Anthem participating provider status will become an absolute precondition for physicians in this specialty to practice.

21. By putting Anthem in the driver's seat in this way, Anthem gains substantial market power, including the ability to dictate which clinicians can successfully compete in the market and which cannot.

22. Put simply, this is not a dispute about a health plan merely paying an out-of-network physician less than the physician believes is appropriate. Anthem's Facility Administrative Policy uses Anthem's must-have status with hospitals and ambulatory surgery centers to impose a vertical exclusionary restraint on facility access.

23. This action does not challenge Anthem's right to negotiate physician contracts, establish physician networks, or decline to pay any particular nonparticipating physician's preferred rate. The challenged conduct is Anthem's use of separate facility contracts to impose financial penalties on third-party hospitals and ASCs unless those facilities restrict independent physicians' access to Anthem-insured patients.

24. The anticompetitive harm arises not from a low reimbursement offer standing alone, but from Anthem's use of facility-level coercion to deprive nonparticipating physicians of the facilities required to compete.

25. By penalizing in-network facilities 7.5% of the allowed amount – and threatening potential network consequences – when they permit nonparticipating physicians to treat Anthem members, Anthem makes Anthem network participation a *de facto* condition of practicing facility-based medicine. For neurosurgeons and other hospital-dependent specialists, access to hospitals and ASCs is an essential input without which they cannot compete. Anthem's policy therefore threatens to foreclose independent nonparticipating physician practices from competing

for commercially insured facility-based patients, not because those practices provide inferior care, but because they decline Anthem's reimbursement terms.

26. Independent physician practices compete on clinical judgment, responsiveness, continuity of care, referral relationships, availability, and patient trust. For facility-based neurosurgery, independent practices also provide an important competitive alternative to hospital-employed or payer-dependent physician networks. Reducing the ability of independent physicians to practice at participating facilities diminishes patient choice and reduces competitive pressure on employed or participating physicians to maintain access, quality, and responsiveness.

27. For all these reasons, and those alleged below, Anthem's new policy is anti-competitive and violates both federal and state law. Accordingly, this Court should declare the new policy illegal and enjoin its application.

## PARTIES

### Plaintiff

28. Plaintiff, Neurological Surgery Practice of Long Island, PLLC, is a New York professional service limited liability corporation with its principal place of business at 100 Merrick Road, Suite 128W, Rockville Centre, New York.

29. Neurological Surgery has consistently chosen to remain independent. Accordingly, its physicians maintain voluntary attending status at local hospitals and ambulatory surgery centers, rather than enter employment or other relationships that enable those hospitals from controlling their destiny.

30. Likewise, Neurological Surgery chooses not to become participating providers in health plan networks established by Anthem and the other large managed care companies. The reasons for this include that non-participating provider status grant it freedom from managed car

company control of their practice and resulting creation of a volume-driven, clinic-style practice that impedes the delivery of high quality, personalized health care.

31. Notwithstanding its non-participating provider status, Neurological Surgery regularly provides medical services each day to enrollees of health plans sponsored or administered by Anthem and other large managed care companies.

**Defendants**

32. Defendant Elevance Health, Inc. is an Indiana corporation with its principal place of business located at 220 Virginia Avenue, Indianapolis, Indiana 46204.

33. Elevance is one of the largest health insurers in the United States in terms of medical membership, serving approximately 45.7 million medical members through its affiliated health plans as of December 31, 2024.

34. Elevance offers a broad spectrum of network-based managed care risk-based plans to individual, employer group, Medicaid, and Medicare markets.

35. In addition, Elevance provides a broad array of managed care services to fee-based customers, including claims processing, stop loss insurance, provider network access, medical management, care management, wellness programs, actuarial services and other administrative services.

36. Elevance provides services to the federal government in connection with its federal health products & services business, which administers the Federal Employee Program.

37. Elevance provides an array of specialty services both to customers of its subsidiary health plans and to unaffiliated health plans, including pharmacy services, stop loss insurance, dental, vision and supplemental health insurance benefits, as well as integrated health services.

38. Relevant to this action, Elevance an independent licensee of the Blue Cross and Blue Shield Association, an association of independent health benefit plans.

39. Elevance serves its members as the Blue Cross licensee for California and as the Blue Cross and Blue Shield ("BCBS") licensee for Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (in the New York City metropolitan area and upstate New York), Ohio, Virginia (excluding the Northern Virginia suburbs of Washington, D.C.) and Wisconsin.

40. Specific to the New York market, Anthem offers individual, family, and employer group health insurance (for small and large employers).

41. Anthem Blue Cross Blue Shield of New York is the trade name under which Elevance, through its New York affiliates, issues and administers health benefit plans in downstate New York, including New York City and Nassau, Suffolk, Westchester, Rockland, and Putnam Counties.

42. Prior to January 1, 2024, Anthem Blue Cross Blue Shield of New York operated under the name Empire Blue Cross Blue Shield.

43. Defendant Anthem HealthChoice Assurance, Inc., formerly known as Empire HealthChoice Assurance, Inc., is a New York insurance company licensed under New York Insurance Law § 1113 to write accident and health insurance in New York state.

44. The principal place of business of Anthem HealthChoice Assurance, Inc. is located at 9 Pine Street, 14th Floor, New York, New York 10005.

45. Defendant Anthem HealthChoice HMO, Inc. is a New York business corporation licensed to operate a New York health maintenance organization under article 44 of the New York Public Health Law.

46. The principal place of business of Anthem HealthChoice HMO, Inc. is located at 220 Virginia Avenue, Mail Point IN0202 B560, Indianapolis, Indiana 46204.

47. Anthem Blue Cross Blue Shield reports over four million members in New York across commercial, Medicaid, and Medicare lines.

48. Anthem Blue Cross Blue Shield has historically been strongest in the NYC metro area, especially among large group commercial, union plans, and hospital-centric network products.

49. The New York metropolitan area commercial health insurance market is highly concentrated within the meaning of the DOJ and FTC Merger Guidelines.

50. Publicly available market analyses consistently identify Anthem Blue Cross Blue Shield and UnitedHealthcare as the two dominant insurers in the New York metropolitan areas commercial market, together accounting for a substantial majority of commercially insured lives.

51. Independent industry analyses have found that these two insurers collectively control well over half—and in some analyses more than three-quarters—of the NYC commercial insurance market, leaving remaining competitors with comparatively small shares.

52. Such a market structure is characteristic of a duopoly, with smaller competitors exerting limited competitive discipline on pricing or network terms.

53. Hospitals throughout the New York metropolitan area, including public systems (NYC Health + Hospitals) and major private systems (Mount Sinai, Northwell Health, NYU Langone, and Catholic Health), participate in Anthem networks. Public data further indicates that virtually all acute-care hospitals in New York are part of the Anthem network.

## JURISDICTION AND VENUE

54. Jurisdiction of this Court is proper under 28 U.S.C. § 1331, providing for original subject-matter jurisdiction by federal courts over "a claim or right arising under" the laws of the United States.

55. This Court has supplemental subject-matter jurisdiction pursuant to 28 U.S.C. § 1367 for pendent state law claims asserted herein.

56. This Court has personal jurisdiction over Defendant Elevance Health, Inc. ("Elevance") because Elevance transacts substantial business in the State of New York, has continuous and systematic contacts with New York, and purposefully avails itself of the privilege of conducting activities within New York.

57. Elevance is a foreign corporation registered to do business in the State of New York. It has designated a registered agent for service of process in New York and has consented to accept service of process through the New York Secretary of State. Elevance maintains a registered address at 28 Liberty Street, New York, New York, and has maintained active registration in New York for many years.

58. Elevance maintains continuous and systematic contacts with New York, including maintaining offices, personnel, and business operations within the State. Elevance employs personnel in New York and conducts corporate functions from New York-based offices.

59. Elevance conducts extensive business in New York through Anthem Blue Cross Blue Shield of New York (formerly known as Empire Blue Cross Blue Shield), which operates as the Blue Cross Blue Shield licensee for New York. Through Anthem Blue Cross Blue Shield of New York, Elevance provides health insurance coverage to millions of New York residents,

contracts with healthcare providers throughout the State, and administers reimbursement for medical services delivered in New York.

60. Anthem Blue Cross Blue Shield of New York acts as Elevance's agent and/or mere department in New York. Elevance exercises substantial control over the operations, policies, and reimbursement practices of its New York subsidiary, and the subsidiary performs services that are essential to Elevance's core business. The New York subsidiary's contacts with this State are therefore properly imputed to Elevance for purposes of personal jurisdiction.

61. Elevance transacts substantial business in New York, including contracting healthcare providers, administering claims, and determining reimbursement for services rendered in New York. Plaintiff's claims arise directly out of these New York-based activities, including the administration and reimbursement of medical claims submitted by New York providers.

62. This Court has personal jurisdiction over Defendant Anthem Blue Cross Blue Shield of New York because it is domiciled in New York, conducts substantial business in New York, and the claims asserted herein arise out of its New York-based activities.

63. Anthem Blue Cross Blue Shield of New York maintains its principal place of business in New York. It maintains its headquarters and principal operations in New York City and conducts extensive and continuous business throughout the State of New York.

64. Anthem Blue Cross Blue Shield of New York is licensed to issue health insurance policies in New York and is the Blue Cross Blue Shield licensee serving the New York market. It provides health coverage to millions of New York residents through employer-sponsored plans, individual market products, and government programs, including Medicare Advantage and Medicaid managed care.

65. Anthem Blue Cross Blue Shield of New York maintains continuous and systematic contacts with New York, including offices, employees, and operations within the State. It administers health benefit plans, processes claims, and engages in provider contracting activities throughout New York daily.

66. Anthem Blue Cross Blue Shield of New York's provider contracting, claims administration, reimbursement determinations, and utilization management activities all occur in substantial part within New York and are directed at providers and patients located in New York.

67. This Court has personal jurisdiction over Defendant Anthem HealthChoice Assurance, Inc. ("Anthem HealthChoice") because Anthem HealthChoice is domiciled in New York, conducts substantial and continuous business in New York, and the claims asserted herein arise out of Anthem HealthChoice's New York-based activities.

68. Anthem HealthChoice Assurance, Inc. is a health insurance company organized under the laws of the State of New York and/or authorized to conduct insurance business in New York. Anthem HealthChoice maintains its principal operations in New York and conducts extensive business throughout the State.

69. Anthem HealthChoice is part of the Anthem Blue Cross Blue Shield of New York enterprise (formerly Empire Blue Cross Blue Shield) and operates within the Elevance Health family of companies. Public filings identify Anthem HealthChoice as a New York-domiciled insurance entity within Elevance's corporate structure.

70. Anthem HealthChoice maintains continuous and systematic contacts with New York, including maintaining offices, employees, and operations within the State. Anthem HealthChoice administers health benefit plans for New York residents and engages in claims administration and reimbursement activities daily within New York.

71. Anthem HealthChoice contracts with hospitals, physicians, and other healthcare providers located throughout New York to provide healthcare services to its members. It administers and reimburses claims for services rendered in New York and participates directly in the New York healthcare market.

72. Anthem HealthChoice's provider contracting, reimbursement determinations, and utilization management activities are directed at providers and patients in New York and occur in substantial part within the State.

73. This Court has personal jurisdiction over Defendant Anthem HealthChoice HMO, Inc. ("Anthem HMO") because Anthem HMO is domiciled in New York, maintains its principal place of business in New York, conducts substantial business in New York, and the claims asserted herein arise out of its New York-based activities.

74. Anthem HealthChoice HMO, Inc. is a domestic business corporation organized under the laws of the State of New York. Anthem HMO maintains its principal executive offices in New York City, including at Penn 1, 35th Floor, New York, New York, and is registered with the New York Department of State with a designated agent for service of process in New York.

75. As a New York-domiciled corporation with its principal place of business in New York, Anthem HMO is subject to general personal jurisdiction in New York.

76. Anthem HMO maintains continuous and systematic contacts with New York, including offices, employees, and ongoing business operations within the State. Anthem HMO administers health maintenance organization (HMO) plans for New York residents and conducts claims administration, utilization management, and reimbursement activities within New York.

77. Anthem HMO participates directly in the New York healthcare market by contracting with hospitals, physicians, and other healthcare providers throughout New York to

provide services to its members. Anthem HMO administers and reimburses claims for medical services rendered in New York and makes coverage and payment determinations affecting New York providers.

78. Anthem HMO operates as part of the Anthem Blue Cross Blue Shield of New York enterprise (formerly Empire Blue Cross Blue Shield), under which it provides HMO products to New York members.

79. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391.

80. Each Defendant is an inhabitant of, is found in, or transacts business in this District. Defendants regularly conduct business in this District, including by contracting with healthcare providers located in this District, administering health benefit plans covering members residing in this District, and making reimbursement determinations affecting medical services rendered in this District.

81. A substantial part of the events giving rise to Plaintiff's claims occurred in this District. Defendants' anticompetitive conduct—including their reimbursement policies, claims administration practices, and contractual arrangements with healthcare providers—was directed at and had substantial effects within this District.

82. Accordingly, venue is proper in this District pursuant to 15 U.S.C. § 22 because Defendants transact business in this District, and pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

83. Plaintiff repeats and re-alleges the matters set forth above as if more fully set forth herein.

### Surgeon-Facility Medical Staff Relationship

84. Like most neurosurgeons and other specialty surgeons, Neurological Surgery's physicians frequently perform medically necessary, lifesaving surgical procedures that must be performed either in a general hospital or an ambulatory surgery center for safety and equipment availability reasons.

85. Under New York law, a general hospital is a hospital engaged in providing medical or surgical services primarily to inpatients by or under the supervision of a physician on a 24-hour basis, with provision for the admission or treatment of persons in need of emergency care and with an organized medical staff and nursing service. *See* N.Y. Public Health Law § 2801.

86. Ambulatory surgery centers provide ambulatory surgery service, which is a service organized to provide those surgical procedures which need to be performed for safety reasons in an operating room on anesthetized patients requiring a stay of less than 24 hours' duration. *See* 10 N.Y.C.R.R. § 755.1.

87. Excluded from this definition are outpatient surgical procedures that can be safely performed in a private physician's office or an outpatient treatment room. *See* 10 N.Y.C.R.R. § 755.1.

88. Ambulatory surgery centers are institutional providers requiring an operating certificate and compliance with 10 N.Y.C.R.R. part 755 structural, staffing, anesthesia, emergency, and quality assurance requirements.

89. General hospitals and ambulatory surgery centers must have an organized medical staff. *See* 10 N,Y.C.R.R. §§ 405.4, 755.2.

90. An "organized medical staff" is a formally constituted body of credentialed practitioners operating under bylaws approved by a facility's governing body and accountable for the quality of medical care delivered at the facility. *See*, *e.g.*, 10 N.Y.C.R.R. § 405.4.

91. Medical staff membership confers clinical privileges but does not create an employment relationship.

92. Voluntary attending physicians remain independent practitioners whose authority to treat patients arises from granted privileges and compliance with medical staff bylaws and facility policies.

93. Hospitals and ambulatory surgery centers retain responsibility for credentialing, peer review, and quality assurance, while clinical decision-making remains the responsibility of the attending physician.

94. The principal New York statute governing the medical staff credentialing process is Public Health Law § 2801-b, which provides, in relevant part: "It shall be an improper practice for the governing body of a hospital to . . . to deny or withhold from a physician, . . . staff membership or professional privileges in a hospital, or to exclude or expel a physician, . . . from staff membership in a hospital or curtail, terminate or diminish in any way a physician's, . . . professional privileges in a hospital, . . . if the reasons stated are unrelated to standards of patient care, patient welfare, the objectives of the institution or the character or competency of the applicant. . . ."

95. Under Medicare and virtually all commercial payer policies, a surgical encounter typically generates at least two distinct types of charges: Facility charges (billed by the hospital

or ambulatory surgery center), and professional charges (billed by the surgeon and other clinicians).

96. This “split billing” structure is foundational to United States health-care reimbursement and reflects the legal separation between facility resources and professional medical judgment.

97. Thus, in connection with a surgical procedure, hospitals and ambulatory surgery centers bill payers for the facility component of care, including the use of the operating room, nursing and technical staff, supplies, equipment, recovery services, and institutional overhead. These charges are commonly referred to as facility fees and compensate the institution for providing the clinical infrastructure required to perform the procedure.

98. By contrast, voluntary attending physicians bill separately for professional services, consisting of their personal medical judgment, skill, time, and responsibility in diagnosing, performing, and managing the procedure.

99. Put simply, physicians do not bill for facility resources, and hospitals and ASCs do not bill for the physician’s professional work.

100. Health plans, such as those administered or sponsored by Anthem, traditionally credential and contract separately with facilities (hospitals and ASCs) on the one hand, and individual physicians or physician groups, on the other hand.

101. As a result, a hospital or ASC can be in-network with a payer even though some or all the physicians practicing there are not.

102. Although this network mismatch historically exposed patients to surprise billing, as we allege below, the federal No Surprises Act now limits patient responsibility to in-network

cost-sharing and shifts payment dispdsutes to an independent resolution process between providers and insurers.

103. Additionally, 17 years ago, New York enacted Chapter 237 of the Laws of 2009, which, at sections 12, 13, and 14, amended New York Insurance Law §§ 3216(i) and 3221(k), and Public Health Law § 4304(ff), to prohibit health plans from penalizing an in-network hospital by treating it as out-of-network because the clinician rendering the care at issue in the hospital was an out-of-network.

**Introduction to the No Surprises Act**

104. In December 2020, the United States Congress enacted the No Surprises Act, which was signed into law as part of the Consolidated Appropriations Act of 2021 (Public Law 116-260; Division BB § 109) on December 27, 2020. It took effect on January 1, 2022.

105. No Surprises Act § 103 amends 42 U.S.C. §§ 300gg *et seq*. to establish an IDR process for non-emergency services performed by non-participating physicians at in-network hospitals, hospital outpatient departments, critical access hospitals, and ambulatory surgical centers and out-of-network emergency services in the emergency department of a hospital or independent freestanding emergency department

106. The No Surprises Act provides that the federal IDR process will apply and may be used by physicians and health plans to determine the out-of-network rate for emergency services in the emergency department of a hospital or independent freestanding emergency department and non-emergency items and services furnished by non-participating providers during a visit to a participating health care facility when a "specified state law" does not apply (42 U.S.C. § 300gg-111).

107. The No Surprises Act prohibits out-of-network providers, such as the Practice, from balance billing or otherwise pursuing payments from health plan members. *See* 42 U.S.C. §§ 300gg-131(a) (emergency services), 300gg-132 (non-emergency services performed by nonparticipating providers at participating facilities).

108. Given this balance billing ban imposed on out-of-network providers, the Act requires health plans, within 30 calendar days after the out-of-network provider transmits its bill to the health plan, to either make an initial payment to the provider or issue a notice of denial of payment. *See id.* §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services).

109. The provider then has 30 days from the day it receives either the initial payment or notice of denial of payment to initiate open negotiations with the health plan for purposes of determining a mutually agreeable amount for the services rendered. This open negotiation period lasts 30 days. *See id.* § 300gg-111(c)(1)(A).

**<u>The Independent Dispute Review (IDR) Process</u>**

110. If the open negotiations do not result in a mutually agreeable amount for the services rendered, then either party (the provider or the health plan) has four days from the end of the open negotiation period to initiate the independent dispute resolution (IDR) process. *See id.* § 300gg-111(c)(1)(B).

111. Under the IDR process, an IDR entity – certified by the federal government – is responsible for obtaining offers from both parties as to the appropriate payment for the service, and employing certain criteria to determine one of the party's offers as the appropriate payment for the service. *See id.* § 300gg-111(c)(5).

112. No later than ten days after the date the IDR entity is selected, the provider and health plan each must submit to the IDR entity a payment offer with supporting information. *See id.* 300gg-111(c)(5)(B).

113. No later than 30 days after the date the IDR entity is selected, the IDR entity must, taking into account the considerations set forth in 42 U.S.C. § 300gg-111(c)(5)(C), "select one of the offers submitted . . . to be the amount of payment for such item or service" and notify the provider and health plan of such determination. *Id.*§ 300gg-111(c)(5)(A).

**<u>Final and Binding IDR Determinations</u>**

114. Congress expressly provided that this IDR "payment determination shall be binding on the parties, involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim. . . ." 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I).

115. Congress further expressly provided that this IDR payment determination "shall not be subject to judicial review, except" on the limited grounds set forth in 9 U.S.C. § 10(a). *See* 42 U.S.C. § 300gg-111(c)(5)(E)(i).

116. These limited grounds are: (a) where the determination was "precured by corruption, fraud, or undue means," 9 U.S.C. §10(a)(1); (b) where there was "evident partiality or corruption" in the proceedings, *id.* § 10(a)(2); (c) where the IDR entity was "guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced," *id.*. § 10(a)(3); or (d) where the IDR entity exceeded its "powers , or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made," *id.* . § 10(a)(4).

117. When the IDR entity has decided the IDR dispute by selecting the provider's offer, the plan has 30 days from the date on which the IDR entity makes its determination to pay the additional reimbursement due the provider. *See* 42 U.S.C. § 300gg-111(c)(6).

**Providers' IDR Successes**

118. As alleged above, the No Surprises Act establishes a final-offer ("baseball-style") arbitration process to resolve payment disputes between health plans and out-of-network providers for covered services.

119. Under this framework, each party submits a single best-and-final payment offer, and a certified IDR entity is required by statute to select one of the two offers, without modification.

120. As the Congressional Research Service has explained in a February 2026 report, the IDR entity's task is not to determine an independent payment amount, but rather to determine which party's offer better represents the value of the item or service at issue based on the statutory factors.

121. Among those factors, the IDR entity must consider the plan's "Qualifying Payment Amount" ("QPA"), defined as the median in-network rate for the relevant service.

122. Federal courts, however, have made clear that the QPA is not entitled to any presumption of correctness and must be weighed alongside other credible evidence submitted by the parties.

123. Since the IDR process became operational in 2022, out-of-network providers have prevailed in a substantial majority of disputes. According to the Congressional Research Service, in disputes resulting in payment determination, certified IDR entities selected the provider's

offer approximately 80 percent of the time in 2023 and approximately 85 percent of the time in 2024.

124. The available data do not support the conclusion that IDR entities are favoring providers as a matter of policy or bias. Rather, the outcomes are consistent with the structural logic of final-offer arbitration. In a baseball-style framework, the arbitrator must select the offer that is relatively more reasonable, not necessarily the offer that reflects a theoretical "correct" price.

125. Empirical analyses published by the Brookings Institution demonstrate that health plans routinely anchor their IDR offers tightly to the QPA, while providers submit offers supported by additional statutory factors, including service complexity, patient acuity, and historical commercial payment levels. When IDR entities select the provider's offer, they are implicitly determining that the plan's offer undervalues the service to a greater degree than the provider's offer overvalues it. (Brookings Institution, *No Surprises Act Arbitration Databook*, updated Apr. 20, 2026).

126. Brookings' analysis of CMS dispute-level data further shows that prevailing IDR awards frequently exceed the QPA by substantial margins. These results indicate that, in many disputes, IDR entities conclude that offers tethered closely to the QPA do not adequately reflect the statutory valuation of the services rendered.

127. Accordingly, the high rate at which providers prevail in the IDR process should be understood as a comparative assessment of offer reasonableness, not as evidence of rate inflation or systemic arbitrator bias. In final-offer arbitration, persistent selection of one party's proposal reflects the arbitrator's judgment that the opposing proposal is relatively less reasonable when evaluated against the statutory criteria. The observed outcomes are a predictable

consequence of a system in which one party consistently submits offers near the statutory floor, while the other submits offers supported by broader valuation evidence authorized by Congress.

**<u>Anthem's New Facility Policy</u>**

128. In late March 2026 Anthem announced a new facility administrative policy that will become effective July 1, 2026 in New York. This new policy is entitled *Facility Administrative Policy: Use of a Nonparticipating Care Provider*.

129. Anthem had previously imposed a similar policy beginning on or after January 1, 2026 in various other states, including Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, Ohio, Wisconsin, and California.

130. A true and correct copy of this policy is annexed hereto as Exhibit A and incorporated herein by reference.

131. Under this new policy, Anthem may impose an administrative penalty equal to 7.5% of the allowed amount on an in-network hospital's or ambulatory surgery center's claims that involve services rendered by out-of-network providers.

132. These hospitals and ambulatory surgery centers also are at risk of termination from Anthem's provider network if they continue to allow out-of-network providers to render services.

133. According to the policy's text, its purpose is to encourage and prioritize care to be delivered from participating care providers when a member receives services in the facility-based setting.

134. The policy provides for two exceptions where use of non-participating providers will not be penalized: (a) emergency services; and (b) when Anthem has granted prior approval to use the non-participating provider in the facility setting.

135. Ariel Bayewitz, vice president of health economics at Elevance told Fierce Healthcare in an interview[1] reported on October 31, 2025 that the policy was designed in response to the No Surprises Act (NSA) independent dispute resolution (IDR) process and that providers generally tend to win when cases progress to IDR, yielding significant payouts to providers by Anthem.

136. Anthem's stated rationale is inconsistent with the No Surprises Act because, for covered services performed by nonparticipating physicians at participating facilities, patients are not responsible for balance bills and are limited to in-network cost sharing.

137. Anthem's policy does not target unlawful balance billing or patient complaints. Instead, it targets the use of nonparticipating physicians regardless of whether the physician complied with the No Surprises Act, accepted the statutory balance-billing prohibition, and used the federal IDR process.

138. The policy penalizes facilities even when the patient suffers no surprise bill, even when the nonparticipating physician complies with federal law, and even when the only dispute concerns the amount Anthem must pay the physician under the statutory payment framework.

**Effect of New Policy**

139. Beginning July 1, 2026, New York hospitals and ASCs have been faced with a complex problem: To avoid a 7.5% cut in their reimbursement from Anthem, they will have to ensure that any clinician rendering care at its facility to an enrollee of an Anthem-administered plan is an Anthem participating provider.

140. As the American Hospital Association has stated "Anthem's policy is fundamentally unworkable for hospital operations. The policy will require hospitals to verify in

[1] https://www.fiercehealthcare.com/payers/anthem-may-penalize-facilities-use-out-network-providers-heres-why (accessed Nov. 4, 2025).

advance the network status of every provider involved in a patient's care. . . ." Letter from Richard J. Pollack, President & Chief Executive Officer, American Hospital Association, to Gail J. Boudreaux, President and Chief Executive Officer, Elevance Health, dated December 17, 2025, at p.2.

141. This is an impossible task for many reasons.

142. First, hospitals cannot predict to any reasonable degree of certainty which clinicians will be involved in each patient's care. A patient's course of illness and resulting treatment is not predictable, there are unexpected events, unforeseen complications, and other issues that require new clinicians to be brought in for treatment or consultations. Simple delays in operating room schedules can require that a new clinician be called into the case.

143. Second, it is not an easy task to determine, at any given time, whether a clinician is participating in the Anthem network applicable to the enrollee's plan. Anthem has various networks; clinicians enter or leave these networks every day for various reasons. Moreover, the American Hospital Association has noted that the current state of Anthem's own provider directories is substandard; these "[m]ajor gaps and errors in provider directories are well documented and routinely confuse patients, providers and even the insurers themselves about who is in network." Pollack-Boudreaux Letter at 2; *see also* Kevin B. O'Reilly*, Evidence on Inaccurate Directories Piles Up. It's Time to Act.,* Am. Med. Ass'n (May 18, 2023) (https://www.ama-assn.org/health-care-advocacy/access-care/evidence-inaccurate-directoriespiles-it-s-time-act); Haeder SF, Zhu JM. *Inaccuracies in provider directories persist for long periods of time*, Health Aff Sch. 2024 Jun 4;2(6).

144. Third, Anthem's policy fails to consider hospital and ASC staffing challenges, the independent status of many provider groups, and basic clinical coverage requirements that most

facilities must meet. *See* Pollack-Boudreau Letter at 2. Many facilities in New York rely on voluntary attending clinicians to provide call and service coverage. These clinicians are not employed by the facility and, accordingly, cannot be required by the hospital to become participating providers in Anthem's networks.

145. Fourth, if the hospitals and the ASCs were to enforce Anthem's policy – and prevent out-of-network clinicians from treating enrollees of Anthem-administered plans in their facilities – the hospitals and ASCs would be trampling upon the patient's freedom to choose their own clinicians as well as clinicians' freedom to control their patients' care by deciding to whom clinical referrals are made.

146. Preventing out-of-network clinicians from treating enrollees of Anthem-administered plans would also cause the facilities to trample upon the medical staff membership rights and professional privileges of these clinicians at their facilities, as set forth in the facilities' medical staff bylaws. *See* 10 N.Y.C.R.R. § 405.4.

147. Notwithstanding the impossibility of facilities verifying in advance the Anthem network status of every clinician involved in the care of patients who are enrollees of Anthem-administered plans, facilities in New York have no real choice but to comply with Anthem's facility administrative policy.

148. This is because failure to comply would result in a 7.5% reduction in the facility's Anthem reimbursement and, ultimately, non-renewal or termination of the facility's Anthem participating provider status, neither of which are an economically viable or feasible choice for New York hospitals or ASCs.

149. As we allege in detail below, given Anthem's enrollment scale and employer penetration, hospitals cannot realistically lose Anthem participation without forfeiting access to a

substantial portion of commercially insured patients. Anthem therefore functions as a "must have payer" for most hospitals in the New York metropolitan area.

150. Moreover, based on surveys conducted by the Healthcare Association of New York State, and other entities, New York hospitals operate on extraordinarily thin margins, with the statewide median effectively at or near zero and a substantial portion of hospitals operating at a loss. Even under more optimistic assumptions, average operating margins rarely exceed the low single digits. Accordingly, New York hospitals disproportionately operate at break-even levels, leaving them highly vulnerable to even small reductions in reimbursement.

151. Because New York hospitals typically operate at or near break-even, even modest reimbursement reductions – far smaller than the 7.5% imposed by Anthem under its policy here – are sufficient to eliminate operating margins and force hospitals into financial distress.

152. Accordingly, New York hospitals are highly incentivized, even compelled, to do everything and anything in their power to comply with Anthem's facility administrative policy to avoid the 7.5% reimbursement reduction and ultimate loss of Anthem participating provider status.

153. Since Anthem announced the Facility Administrative Policy, representatives of one or more facilities at which Neurological Surgery physicians hold privileges have communicated to Neurological Surgery physicians that the facility is evaluating whether nonparticipating physicians may continue to schedule or perform procedures for Anthem-insured patients after July 1, 2026.

154. Earlier this year, Anthem representatives communicated with representatives of an Anthem-participating ambulatory surgery center located in Manhattan. During that communication, Anthem identified by name certain nonparticipating surgeons who had

performed services for Anthem members at the facility. Anthem provided or referred to a list of those nonparticipating physicians and advised the facility that continued use of such physicians for Anthem members would jeopardize the facility's continued Anthem network participation and/or renewal of its participating provider agreement.

155. After receiving Anthem's communication, the facility advised affected physicians that they could not continue treating Anthem-insured patients at the facility unless they became Anthem-participating providers or obtained Anthem's prior approval.

156. The facility's response was not based on patient-care concerns, physician competence, quality issues, peer review, utilization review, or medical staff bylaws. It was based solely on Anthem's contracting status requirement and the threatened economic consequences imposed by Anthem.

157. This underscores the simple reality that, because of the difficulty that facilities will have in verifying in advance the Anthem network status of every clinician who may be involved in the care of an enrollee of an Anthem-administered plan, most facilities will attempt to bar clinicians from providing services at their facility unless they have Anthem-participating provider status.

158. This makes Anthem-participating provider status a necessary credential for clinicians to access hospitals and ASCs in New York.

159. Many clinicians, particularly surgeons and other physicians with hospital-based specialties, require access to hospitals and ASCs to provide services. Thus, these clinicians' very ability to provide services is dependent on their Anthem participating provider status, which only Anthem has the ability to grant or withhold.

160. Accordingly, Anthem becomes the gatekeeper for determining which clinicians have access to New York hospitals and ASCs, conferring upon them substantial market power and the ability to demand significantly reduced reimbursement rates from clinicians, and other concessions.

161. Anthem's policy changes the bargaining dynamic between Anthem and independent physicians. Before the policy, a physician could remain nonparticipating, treat Anthem members at participating facilities, comply with the No Surprises Act's balance-billing prohibition, and submit payment disputes to IDR. After the policy, Anthem can threaten the facility's reimbursement and network status unless the facility pressures the physician to become Anthem-participating or stops allowing the physician to treat Anthem members.

162. As a practical matter, the policy gives Anthem leverage over physicians with whom Anthem has no contract by using Anthem's separate contracts with facilities to control the physician's access to patients and operating-room facilities.

163. This leverage permits Anthem to demand reimbursement rates and contractual terms that independent physicians would not accept in a competitive bargaining environment.

**Irreparable Harm to Neurological Surgery**

164. As alleged above, Neurological Surgery has consistently chosen to remain independent. Accordingly, its physicians maintain voluntary attending status at local hospitals and ambulatory surgery centers, rather than enter employment or other relationships that enable those hospitals from controlling their destiny.

165. Likewise, Neurological Surgery chooses not to become participating providers in health plan networks established by Anthem and the other large managed care companies. The reasons for this include that non-participating provider status grant it freedom from managed

care company control of their practice and resulting creation of a volume-driven, clinic-style practice that impedes the delivery of high quality, personalized health care.

166. However, notwithstanding its non-participating provider status, Neurological Surgery regularly provides medical services each day to enrollees of health plans sponsored or administered by Anthem and other large managed care companies.

167. During the most recent twelve-month period for which data is available, Anthem-administered plans represented approximately 15% of Neurological Surgery's total patients, and approximately 35% of its total practice revenue.

168. Anthem-administered plans represented a disproportionately high share of Neurological Surgery's revenue because Anthem members frequently receive commercially reimbursed facility-based surgical services, which are higher-value services than routine office visits.

169. Unpaid independent dispute resolution awards, rising costs, and overall decreasing reimbursement rates have placed a severe and unsustainable financial strain on the practice, jeopardizing its ability to provide quality neurosurgery services in New York.

170. As alleged above, once Anthem's Facility Administrative Policy is enforced, hospitals and ASCs in New York will exclude clinicians, like Neurological Surgery, who do not participate in Anthem's networks, from providing services at their facilities.

171. Neurological Surgery requires access to these facilities to provide its services.

172. Thus, Anthem's Facility Administrative Policy puts Neurological Surgery's survival in substantial jeopardy. Neurological Surgery will be relying totally upon whether Anthem, as gatekeeper, decides to permit Neurological Surgery to enter its network. This gives Anthem substantial market power and ability to demand below-market reimbursement rates and

other concessions from Neurological Surgery if it decides at all to let Neurological Surgery into its network.

173. Unless the policy is enjoined, Neurological Surgery expects that facilities will refuse to schedule Anthem-insured patients with Neurological Surgery physicians, causing immediate loss of cases, revenue, goodwill, and continuity-of-care opportunities.

**dANTITRUST ANALYSIS**

174. Based on all the foregoing, Anthem, a dominant commercial payer and must-have buyer of hospital facility services in the New York metropolitan area, has imposed a vertical contractual restraint on in-network hospitals and ASCs through its recently adopted Facility Administrative Policy. The restraint penalizes facilities unless they ensure that professional services furnished to Anthem members at the facility are provided only by Anthem-participating clinicians or by nonparticipating clinicians preapproved by Anthem. Because facility access is an essential input for neurosurgeons and other facility-dependent specialists, Anthem's restraint substantially forecloses out-of-network independent physicians from competing for commercially insured facility-based patients and thereby violates both the Sherman Act and the Donnelly Act.

**Relevant Markets and Market Power**

*Commercial Facility Services Purchasing Market*

175. The first relevant market is one for the purchase of acute care hospital services reimbursed through commercial health insurance plans (the "Commercial Facility Services Purchasing Market").

176. Commercially reimbursed hospital services constitute a distinct antitrust product market because they are purchased by private insurers or self-funded employer plans, not the government; reimbursed pursuant to negotiated rates rather than administered fee schedules; and not reasonably interchangeable, from either the payer's or provider's perspective, with Medicare, Medicaid, or uninsured care.

177. Hospitals cannot replace lost commercial revenue with public payer volume without suffering significant economic harm, and insurers do not view public payer hospital services as substitutes for commercially reimbursed services.

178. The relevant geographic area for this market is the New York City metropolitan area, including New York City and surrounding commuter counties (the "NYC metropolitan Market").

179. This reflects patient travel and referral patterns; employer-based insurance offerings concentrated in the region; insurer network design organized on a metropolitan, not national, basis; and the way insurers and hospitals negotiate inclusion and reimbursement.

180. Hospitals located outside the NYC metropolitan area are not reasonable substitutes for hospitals within the market for a substantial number of commercially insured patients.

181. The Commercial Hospital Services Market in the NYC Metropolitan area is highly concentrated.

182. On the seller side, the provision of hospital services in the New York metropolitan area is dominated by a small number of large integrated health systems, including Northwell Health, NewYork-Presbyterian Healthcare System, NYU Langone Health, NYC Health + Hospitals, Mount Sinai Health System, Montefiore Health System, Catholic Health, and Westchester Medical Center Health Network. These entities collectively control a substantial share of inpatient beds, physician networks, and outpatient facilities in the relevant market.

183. On the buyer side, independent analyses of commercial health insurance markets demonstrate that most U.S. metropolitan areas, including the New York City metropolitan area, are "highly concentrated" at the insurer level, with the top one or two insurers controlling a dominant share of commercial enrollment.

184. New York State's commercial insurance market is dominated by a small number of large insurers, including Empire Blue Cross Blue Shield (now Anthem Blue Cross and Blue Shield) and UnitedHealthcare.

185. As a result of this concentration, hospitals seeking access to commercially insured patients in the NYC Metropolitan Market must negotiate with a limited number of large insurers that act as gatekeepers to patient volume.

186. Anthem possesses substantial market power in the Commercial Hospital Services Market in the NYC Metropolitan area. Its market power arises from several reinforcing factors.

187. First, Anthem provides health coverage to millions of New York residents and is one of the largest commercial insurers in the NYC metropolitan area. A significant share of employers, unions, and public sector plans offer Anthem products as a primary or default option.

188. Because of Anthem's enrollment scale and employer penetration, hospitals cannot realistically decline Anthem participation without forfeiting access to a substantial portion of commercially insured patients. Anthem therefore functions as a "must have payer" for most hospitals in the NYC Metropolitan area.

189. Given this, Anthem maintains a broad and effectively universal hospital network. Publicly available data indicates that virtually all acute care hospitals in New York participate in the Blue Cross Blue Shield network. Accordingly, the major health systems in the New York metropolitan area participate in Anthem's network through their affiliated hospitals.

190. Individual hospitals, even large health systems are generally not "must have" providers for Anthem, given the dense supply of hospitals and overlapping service areas in the region. Anthem can credibly threaten network exclusion or adverse contracting terms, while hospitals cannot credibly threaten to replace Anthem volume through alternative payers.

191. Hospitals in the NYC Metropolitan area rely disproportionately on commercial reimbursement to offset losses incurred from Medicare, Medicaid, and uncompensated care. Exclusion from Anthem's network results in immediate and substantial loss of profitable volume that cannot be economically replaced.

192. As a direct and foreseeable consequence of Anthem's market power, hospitals excluded from Anthem's network experience substantial losses in patient volume, particularly for elective and high margin services.

193. Patients are steered away from out of network hospitals through benefit design, out of network penalties, and employer plan restrictions.

194. Competing hospitals that remain in network gain an artificial competitive advantage unrelated to quality or efficiency.

195. Hospitals are forced to accept unfavorable reimbursement rates or contractual terms to avoid economically damaging exclusion.

196. These effects are not theoretical. In the NYC Metropolitan area, prolonged exclusion from Anthem's network is economically unsustainable for most hospitals, demonstrating Anthem's ability to control access to commercially insured demand.

*Commercially Reimbursed Facility-Based Neurosurgical Services Market*

197. The second relevant product market is the market for commercially reimbursed facility-based neurosurgical professional services.

198. Neurosurgical procedures requiring an operating room, anesthesia, inpatient capability, specialized equipment, nursing support, and post-operative facility resources cannot be performed safely or legally in ordinary physician offices.

199. For those services, hospitals and ASCs are necessary clinical inputs, and facility-based neurosurgical professional services are not reasonably interchangeable with office-based

professional services, primary care services, non-surgical neurological services, Medicare services, Medicaid services, or uninsured care.

200. Indeed, neurosurgical procedures requiring operating rooms generate the overwhelming majority of Neurological Surgery's surgical revenue.

201. Such procedures cannot be practically supplied through office-based settings.

202. The relevant geographic market for facility-based neurosurgical professional services is Long Island and the New York City metropolitan area, including the counties from which Neurological Surgery draws patients and in which its physicians maintain admitting privileges and perform surgical procedures.

203. Patients requiring neurosurgical intervention generally seek care from physicians with privileges at Long Island and New York Citty hospitals and ASCs possessing neurosurgical capabilities, and facilities outside the region are not practical substitutes for a substantial number of commercially insured patients requiring timely neurosurgical care.

204. Indeed, Neurological Surgery physicians all perform their surgical procedures, with rare exceptions, at Long Island-based facilities, including Mount Sinai South Nassau, Mercy Medical Center, NYU Langone Long Island, and St. Francis Hospital.

205. Relatedly, Neurological Surgery's physicians currently maintain clinical privileges, surgical scheduling access, call coverage responsibilities, or referral relationships at the following facilities: Mount Sinai South Nassau, Mercy Medical Center, NYU Langone Long Island, and St. Francis Hospital. Each of these facilities participates in one or more Anthem commercial networks.

206. For facility-based neurosurgical procedures, these facilities are not interchangeable with ordinary office settings because the relevant procedures require operating rooms, anesthesia services, nursing support, imaging resources, inpatient backup, emergency response capability, and post-operative recovery capacity.

207. If Neurological Surgery loses the ability to treat Anthem members at those facilities, it cannot replace that lost facility access by performing the same procedures in its office or by moving the patients to nonparticipating facilities.

**Concerted Action and Facility Agreements**

208. Anthem implements the Facility Administrative Policy through its participating provider agreements, provider manuals, administrative policies, and reimbursement rules applicable to in-network hospitals and ambulatory surgery centers. Those facilities are not strangers to Anthem's conduct; they are the contractual counterparties through which Anthem's restraint operates.

209. Specifically, Anthem has communicated its Facility Administrative Policy to participating facilities in New York and required facility compliance as a condition of continued reimbursement and network participation.

210. Hospitals and ASCs thereafter agreed to comply, as a condition of receiving full contracted reimbursement and maintaining network participation, with the Facility Administrative Policy through existing provider agreements and participation agreements.

211. The challenged restraint therefore constitutes concerted action. Anthem has entered into vertical agreements and arrangements with participating hospitals and ASCs that

impose financial penalties on facilities when they permit nonparticipating clinicians to provide care to Anthem members, and that create direct economic incentives for facilities to exclude, restrict, discipline, or coerce nonparticipating physicians. These agreements and arrangements have the purpose and predictable effect of foreclosing nonparticipating physicians from facility-based practice unless they accept Anthem network participation and Anthem's reimbursement terms.

**Substantial Foreclosure**

212. Anthem's restraint substantially forecloses competition because a commercially meaningful percentage of facility-based neurosurgical patients in the relevant geographic market are covered by Anthem-administered plans, and a commercially meaningful percentage of hospitals and ASCs necessary for neurosurgical practice participate in Anthem's networks. A neurosurgeon excluded from treating Anthem members at Anthem-participating facilities loses access not merely to isolated patients, but to a substantial stream of commercially insured facility-based cases necessary to sustain an independent practice.

213. The foreclosure is magnified because hospitals and ASCs cannot practically administer Anthem's policy procedure-by-procedure or clinician-by-clinician. Given emergency coverage needs, operating-room scheduling, call coverage, consultations, and the unreliability of health plan network-status information, facilities are predictably incentivized to adopt categorical rules barring nonparticipating physicians from treating Anthem members or pressuring those physicians to become Anthem-participating. As a result, Anthem's facility policy functions as a market-wide exclusionary device rather than as a claim-by-claim utilization rule.

214. During the most recent twelve-month period for which data is available, Anthem-administered plans represented approximately 15% of Neurological Surgery's total patients, and approximately 35% of its total practice revenue.

215. In the relevant geographic market, a substantial majority of hospitals and ambulatory surgery centers capable of supporting facility-based neurosurgical procedures participate in Anthem's commercial networks.

216. All Long Island hospitals through which Neurological Surgery provides care participate in Anthem's network.

217. Relatedly, upon information and belief, Anthem-participating hospitals and ambulatory surgical centers account for a substantial majority of the commercially reimbursed facility-based neurosurgical procedures performed in Long Island and the New York City metropolitan area.

218. The facilities required for facility-based neurosurgical services are limited in number because they must maintain operating rooms, neurosurgical equipment, anesthesia coverage, trained nursing personnel, imaging resources, and emergency backup capacity.

219. Loss of access to these facilities accordingly would eliminate a substantial percentage of Neurological Surgery's commercially insured patient base.

220. Independent nonparticipating neurosurgeons cannot meaningfully compete for commercially insured facility-based neurosurgical patients if Anthem-participating facilities refuse to schedule or allow such physicians to treat Anthem members.

221. The policy therefore forecloses competition at the point where competition occurs: patient access to qualified neurosurgeons with privileges at facilities capable of performing neurosurgical procedures.

222. Anthem cannot justify the restraint as necessary to protect patients from surprise bills. Congress already addressed that concern through the No Surprises Act, which prohibits balance billing for covered out-of-network services furnished by nonparticipating providers at participating facilities and channels payment disputes into the federal IDR process. Anthem has less restrictive alternatives available, including improving provider directories, expanding its physician network through competitive contracting, timely paying IDR determinations, seeking facility-specific operational protocols, or seeking recognized regulatory relief. What Anthem may not do is use facility-level penalties to make independent nonparticipating physicians economically unable to practice unless they accept Anthem's terms.

223. Anthem could address any legitimate concern regarding member cost exposure through targeted enforcement of the No Surprises Act's balance-billing protections, improved member disclosures, accurate provider directories, case-by-case prior authorization, network adequacy contracting, direct physician contracting, or facility-specific coordination procedures that do not penalize facilities for allowing qualified nonparticipating physicians to treat patients.

224. Anthem did not adopt these narrower alternatives. Instead, it adopted a broad penalty structure that predictably shifts pressure to facilities to exclude physicians based on Anthem contracting status.

**Antitrust Injury**

225. As alleged above, Neurological Surgery is sustaining and has sustained substantial, immediate, and irreparable injury because of Anthem's policy.

226. Neurological Surgery's injury is antitrust injury because it flows from the exclusionary and foreclosure effects of Anthem's restraint, not merely from Anthem's refusal to pay Neurological Surgery's preferred reimbursement rate. Anthem's policy threatens to deprive Neurological Surgery and similarly situated independent physicians of access to hospitals and ASCs necessary to compete in facility-based neurosurgical services.

227. The injury – loss of facility access, loss of patient volume, coerced network participation, reduced physician independence, reduced output, diminished patient choice, and degradation of quality – is the type of injury the antitrust laws are designed to prevent.

228. Absent Anthem's challenged restraint, hospitals and ASCs would have independent medical-staff, coverage, quality, and patient-care reasons to continue allowing qualified nonparticipating physicians to treat patients at their facilities.

229. Anthem's policy overrides those competitive and clinical choices by imposing payer-driven financial penalties that cause facilities to exclude physicians based on Anthem contracting status rather than quality, competence, patient preference, or legitimate facility needs.

230. Anthem's policy will reduce patient choice by preventing Anthem members who have selected Neurological Surgery physicians from continuing care with those physicians at Anthem-participating facilities.

231. Neurological Surgery treats patients with complex spinal, cranial, neurological, and pain-related conditions that often require continuity of care across office evaluation, imaging

review, surgical scheduling, inpatient treatment, and post-operative follow-up. Disrupting the ability of those patients to continue with their chosen surgeon at the facility where the surgeon has privileges impairs continuity of care.

232. For patients requiring time-sensitive neurosurgical intervention, substitution to another surgeon is not costless or immediate. It requires new evaluation, review of imaging, pre-surgical planning, facility scheduling, and often new preauthorization activities.

233. In certain subspecialty areas of neurosurgery, Anthem's participating provider network is not a practical substitute for Neurological Surgery's services because of limited specialist availability, limited operating-room access, patient preference, continuity-of-care needs, referral patterns, and delays in scheduling.

234. Anthem's policy does not increase the number of participating neurosurgeons available to members; instead, it reduces the availability of existing qualified nonparticipating neurosurgeons at participating facilities.

235. Neurological Surgery has already received inquiries or concerns from patients, referring physicians, or facility personnel regarding whether Anthem-insured patients may continue to receive facility-based care from Neurological Surgery physicians.

236. In summary, the causal chain is direct: Anthem threatens facilities with a 7.5% payment reduction and potential network consequences; facilities respond by restricting or threatening to restrict nonparticipating physicians; independent nonparticipating neurosurgeons lose access to Anthem-insured facility-based patients; patients lose access to their chosen independent specialists; and Anthem gains leverage to compel physicians to accept Anthem's reimbursement terms.

237. This harm extends beyond Neurological Surgery. Anthem's policy applies generally to nonparticipating physicians practicing at Anthem-participating facilities throughout New York. As implemented, it will predictably reduce the number of independent nonparticipating specialists available to treat Anthem members at participating facilities, reduce physician choice, reduce independent specialist output, increase pressure on physicians to become employed by hospitals or large groups, and accelerate provider consolidation. Those effects are market-wide competitive harms, not merely private harm to one physician practice.

## FIRST CAUSE OF ACTION

238. Neurological Surgery repeats and re-alleges each of the above paragraphs as though fully set forth herein.

239. Anthem, a dominant commercial payer and must-have buyer of hospital facility services in the New York metropolitan area, has imposed a vertical contractual restraint on in-network hospitals and ASCs.

240. The restraint penalizes facilities unless they ensure that professional services furnished to Anthem members at the facility are provided only by Anthem-participating clinicians or by nonparticipating clinicians preapproved by Anthem.

241. Because facility access is an essential input for neurosurgeons and other facility-dependent specialists, Anthem's restraint substantially forecloses out-of-network independent physicians from competing for commercially insured facility-based patients.

242. Anthem possesses and exercises market power in the relevant product and geographic markets identified in this Complaint.

243. At all times relevant to this Complaint, Anthem, together with its co-conspirators, has entered contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

244. These contracts, combinations, or conspiracies have caused substantial anticompetitive effects, including the exclusion of competition of Neurological Surgery and other independent physician providers ultimately leading to lower quality medical services available to patients.

245. These contracts, combinations, or conspiracies have no legitimate business justification or offsetting procompetitive benefit. They achieve no legitimate efficiency benefit to counterbalance the anticompetitive effects that they cause.

246. Neurological Surgery is, and will continue to be, irreparably harmed by the implementation of the facility administrative policy entitled *Use of a Nonparticipating Care Provider.*

247. Neurological Surgery has no adequate remedy at law.

248. Because of the foregoing, Neurological Surgery has been damaged in an amount to be determined at trial.

249. Because of the foregoing, Neurological Surgery is entitled to a declaration that Anthem's newly adopted facility administrative policy entitled *Use of a Nonparticipating Care Provider* violates Section 1 of the Sherman Act (15 U.S.C. § 1).

250. Because of the foregoing, Neurological Surgery is entitled to a permanent injunction restraining and enjoining Anthem's implementation of its newly adopted facility administrative policy entitled *Use of a Nonparticipating Care Provider.*

## SECOND CAUSE OF ACTION

251. Neurological Surgery repeats and re-alleges each of the above paragraphs as though fully set forth herein.

252. The challenged Facility Administrative Policy also constitutes an unlawful "arrangement" under the Donnelly Act, New York General Business Law § 340.

253. Anthem's policy constitutes an anticompetitive "arrangement" within the meaning of the Donnelly Act among Anthem and participating facilities because it conditions facility reimbursement and network participation on facility conduct that excludes nonparticipating physicians from treating Anthem members.

254. Anthem's policy operates through coordinated contractual relationships with participating hospitals and ASCs to exclude nonparticipating physicians from facility-based competition.

255. Anthem possesses and exercises market power in the relevant product and geographic markets identified in this Complaint.

256. At all times relevant to this Complaint, Anthem, together with its co-conspirators, has entered contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq.*

257. These contracts, combinations, or conspiracies have caused substantial anticompetitive effects, including the exclusion of competition of Neurological Surgery and other independent providers of medical services, ultimately leading to lower quality medical services available to patients.

258. These contracts, combinations, or conspiracies have no legitimate business justification or offsetting procompetitive benefit. They achieve no legitimate efficiency benefit to counterbalance the anticompetitive effects that they cause.

259. Neurological Surgery is, and will continue to be, irreparably harmed by the implementation of the facility administrative policy entitled *Use of a Nonparticipating Care Provider.*

260. Neurological Surgery has no adequate remedy at law.

261. Because of the foregoing, Neurological Surgery has been damaged in an amount to be determined at trial.

262. Because of the foregoing, Neurological Surgery is entitled to a declaration that Anthem's newly adopted facility administrative policy entitled *Use of a Nonparticipating Care Provider* violates the Donnelly Act, New York General Business Law §§ 340 *et seq*.

263. Because of the foregoing, Neurological Surgery is entitled to a permanent injunction restraining and enjoining Anthem's implementation of its newly adopted facility administrative policy entitled *Use of a Nonparticipating Care Provider.*

## **THIRD CAUSE OF ACTION**

264. Neurological Surgery repeats and re-alleges every allegation contained in this Complaint as if fully set forth herein.

265. Anthem is a purchaser and reimburser of commercially reimbursed facility-based physician services because, for Anthem members, Anthem determines whether and how much physicians are paid for covered services, including services furnished by nonparticipating physicians at participating facilities.

266. Physicians cannot replace Anthem-covered facility-based volume with Medicare, Medicaid, uninsured, or self-pay volume because those payers and patients are not economically interchangeable with commercial insurance reimbursement.

267. Nor can physicians practically redirect Anthem-insured patients to other commercial payers; the patient's payer is determined by employer, union, government, or individual plan selection before the need for neurosurgical services arises.

268. Anthem's policy allows it to suppress physician compensation not by offering a more attractive contract, but by threatening physicians' facility access unless they accept Anthem's network terms.

269. For Neurological Surgery, Anthem-administered plans account for approximately 35% of neurosurgical revenue, making Anthem volume economically non-substitutable in the short and medium term.

270. Anthem possesses monopsony power, or at minimum a dangerous probability of acquiring monopsony power, in the purchase of commercially reimbursed facility-based physician services in the relevant geographic market.

271. Anthem's monopsony power arises from its large commercial enrollment, its must-have status with hospitals and ASCs, the inability of physicians to replace Anthem-covered facility-based volume with other commercially insured patients, and the inability of hospitals and ASCs to resist Anthem's facility policy without suffering substantial economic harm.

272. Anthem has willfully acquired, maintained, and attempted to enhance that monopsony power through exclusionary conduct rather than competition on the merits.

273. By using its facility contracts to condition full facility reimbursement and continued network participation on the exclusion or coercion of nonparticipating physicians,

Anthem makes acceptance of Anthem’s physician reimbursement terms a practical prerequisite to facility-based practice. Anthem’s conduct suppresses physician compensation below competitive levels and causes anticompetitive effects in the form of reduced output, reduced access to independent physicians, diminished patient choice, increased consolidation, and degradation of quality.

274. Anthem’s conduct has the purpose and effect of excluding independent, non-participating physicians from the market.

275. This exclusionary scheme suppresses competition, reduces physician independence, facilitates a race to the bottom on reimbursement rates, and harms patients through reduced output, diminished quality of care, and the loss of independent physician practices. It lacks any legitimate business justification.

276. As a direct and proximate result of Anthem’s monopolization and attempted monopolization, Neurological Surgery has suffered and will continue to suffer antitrust injury, including lost business opportunities, foreclosure from necessary competitive inputs, coerced acceptance of below-market rates, and irreparable harm to their ability to compete.

277. Indeed, Anthem's conduct suppresses physician compensation and physician bargaining power by making Anthem network participation a practical prerequisite for access to commercially significant facility-based practice opportunities.

278. Anthem’s conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2, and Plaintiff are entitled to declaratory and injunctive relief, treble damages, attorneys’ fees, and costs.

## FOURTH CAUSE OF ACTION

279. Neurological Surgery repeats and re-alleges every allegation contained in this Complaint as if fully set forth herein.

280. For many years prior to Anthem's adoption of the Facility Administrative Policy, Neurological Surgery maintained ongoing and economically significant business relationships with hospitals and ambulatory surgery centers throughout Nassau County, Suffolk County, and the New York metropolitan area, these relationships include Mount Sinai South Nassau, NYU Langone Long Island, and Mercy Medical Center, among others.

281. Those relationships included medical staff membership, clinical privileges, surgical scheduling opportunities, call coverage responsibilities, treatment of hospitalized patients, treatment of ambulatory surgery patients, and the provision of professional neurosurgical services to commercially insured patients.

282. Anthem knew of these relationships. Through the processing and administration of claims submitted for services performed by Neurological Surgery physicians at participating facilities, Anthem possessed detailed information regarding the facilities at which Neurological Surgery physicians practiced, the frequency of those services, and the facilities' reliance on Neurological Surgery physicians for treatment of Anthem members.

283. Anthem adopted the Facility Administrative Policy with knowledge that participating hospitals and ambulatory surgery centers would be forced to choose between maintaining established relationships with nonparticipating physicians and avoiding substantial Anthem-imposed financial penalties and potential network consequences.

284. Anthem employed wrongful means by leveraging its market power to impose substantial reimbursement penalties and threats of network termination on facilities unless those

facilities curtailed, altered, or terminated existing relationships with nonparticipating physicians. Anthem's conduct was directed not toward competition on the merits, but toward coercing third-party facilities to exclude physicians based solely upon Anthem contracting status.

285. Anthem's conduct further constituted wrongful means because it formed part of the anticompetitive exclusionary scheme alleged elsewhere in this Complaint and was intended to foreclose independent physicians from competing absent acceptance of Anthem's contractual terms.

286. As a direct consequence of Anthem's conduct, representatives of facilities have communicated with Neurological Surgery physicians or personnel regarding whether Neurological Surgery may continue to perform procedures for Anthem-insured patients after July 1, 2026 unless Neurological Surgery becomes Anthem-participating or obtains Anthem's prior approval.

287. Those communications included concerns regarding future surgical scheduling, operating-room availability, and treatment of Anthem-insured patients.

288. These communications were not prompted by any quality-of-care concern, peer review issue, patient complaint, credentialing deficiency, competence issue, utilization issue, or violation of medical staff bylaws by Neurological Surgery.

289. Anthem therefore intentionally disrupted Neurological Surgery's existing business relationships with facilities by inducing those facilities to restrict or threaten to restrict Neurological Surgery's ability to treat Anthem-insured patients.

290. As a direct and proximate result of Anthem's tortious interference, Neurological Surgery has suffered and will continue to suffer damages, including loss of hospital privileges, loss of patient volume, damage to goodwill, and irreparable competitive harm.

## FIFTH CAUSE OF ACTION

291. Neurological Surgery repeats and re-alleges each and every allegation contained in this Complaint as if fully set forth herein.

292. Anthem has engaged in deceptive acts and practices in the conduct of business, trade, and commerce within the meaning of New York General Business Law § 349.

293. Anthem's representations concerning the purpose and benefits of the Facility Administrative Policy were directed not merely to providers but to employers, plan sponsors, prospective members, existing members, regulators, hospitals, and the public at large. Anthem publicly promoted the policy as a consumer-protection initiative intended to advance affordability and protect members from out-of-network costs.

294. Anthem’s public communications described the policy as protecting members from out-of-network costs but did not disclose that covered Anthem members already are protected from balance billing for the relevant services by the No Surprises Act.

295. Anthem also did not disclose that the policy would incentivize participating facilities to reduce the availability of independent specialists, including neurosurgeons, even where those physicians were credentialed, privileged, clinically appropriate, and chosen by the patient.

296. The omission was material because a reasonable employer, plan sponsor, or member would consider it important that an in-network hospital might not provide meaningful access to the independent specialists who practice there.

297. At the time Anthem made those representations, Anthem knew that members receiving covered services at in-network hospitals and ambulatory surgery centers already were protected from balance billing by the No Surprises Act.

298. Anthem further knew that payment disputes arising from such services were governed by the federal IDR process and not by patient billing.

299. Anthem failed to disclose that implementation of the Facility Administrative Policy would foreseeably pressure hospitals and ambulatory surgery centers to restrict, curtail, discourage, or eliminate participation by independent nonparticipating physicians, thereby reducing physician choice, continuity of care, and access to specialized services for members.

300. Anthem's communications created the impression that members would continue to enjoy meaningful access to medical services at participating hospitals and ambulatory surgery centers. Anthem failed to disclose that hospitals designated as participating facilities could experience reduced physician availability and reduced access to independent specialists as a foreseeable consequence of the policy.

301. Employers and members selecting Anthem products are likely to rely upon Anthem’s representations regarding access to care and provider availability.

302. Those purchasers are not informed that Anthem’s Facility Administrative Policy may reduce the availability of independent specialists and continuity of care.

303. As a direct result of Anthem's deceptive acts and omissions, consumers are at risk of receiving materially inaccurate information concerning the availability of specialists, continuity of care, and physician choice available through Anthem products.

304. Consumers may purchase, maintain, or select Anthem coverage based upon representations that omit material information concerning the practical effects of the policy on access to care.

305. Neurological Surgery has been injured by Anthem’s deceptive conduct because Anthem’s consumer-facing justification concealed the true competitive purpose and effect of the

policy, facilitated implementation of the policy among employers, members, and facilities, and caused injury to Neurological Surgery through reduced patient access, disrupted facility relationships, and threatened exclusion from Anthem-insured facility-based care.

**SIXTH CAUSE OF ACTION**

306. Neurological Surgery repeats and re-alleges every allegation contained in this Complaint as if fully set forth herein.

307. The No Surprises Act establishes a comprehensive federal framework governing the consequences of nonparticipating physician services furnished at participating facilities.

308. Congress deliberately balanced competing interests by prohibiting balance billing while preserving a federally regulated mechanism for resolving reimbursement disputes between providers and payers.

309. Anthem adopted the Facility Administrative Policy with the purpose and foreseeable effect of reducing or eliminating circumstances in which reimbursement disputes would proceed through the federal IDR process established by Congress.

310. Rather than permitting reimbursement disputes to be resolved through the framework established by Congress, Anthem seeks to replace that statutory framework with economic pressure imposed upon hospitals and ambulatory surgery centers, thereby compelling physicians to accept Anthem participation agreements and Anthem reimbursement terms irrespective of the outcomes that would otherwise result under the federal IDR process.

311. If implemented broadly throughout New York, Anthem's Facility Administrative Policy would substantially impair the operation of the federal statutory framework by reducing the effective availability of nonparticipating physicians at participating facilities and thereby reducing the practical operation of the IDR system established by Congress.

312. Anthem's conduct conflicts with the structure, purpose, and operation of the No Surprises Act and threatens to render the federal statutory scheme ineffective in the New York metropolitan area.

313. Neurological Surgery does not seek damages under the No Surprises Act or enforcement of any individual IDR determination in this cause of action. Rather, it seeks declaratory relief concerning whether Anthem may use facility-contract penalties to make unavailable, in practical effect, the statutory circumstances under which Congress authorized nonparticipating physicians to furnish services at participating facilities subject to the NSA's protections and IDR framework.

314. Anthem's policy is directed specifically at the category of services Congress regulated: services furnished by nonparticipating physicians at participating facilities where the patient is protected from balance billing and the provider-plan payment dispute is resolved through negotiation or IDR.

315. Anthem's policy penalizes the facility not because of any patient harm, quality issue, or unlawful billing conduct, but because the physician remains nonparticipating and may invoke the statutory reimbursement framework.

316. An actual and justiciable controversy exists as to whether Anthem's policy unlawfully interferes with and undermines the federal No Surprises Act framework.

317. Neurological Surgery does not seek enforcement of any individual IDR award.

318. Neurological Surgery instead seeks a declaration concerning whether Anthem's Facility Administrative Policy is incompatible with and frustrates the statutory framework established by Congress in the No Surprises Act.

319. Plaintiff will suffer irreparable harm, absent declaratory and injunctive relief, and there is no adequate remedy at law.

## DEMAND FOR RELIEF

**WHEREFORE**, Neurological Surgery respectfully requests the following relief:

1. on the first cause of action, awarding Neurological Surgery (a) a declaration that Anthem's newly adopted facility administrative policy entitled *Use of a Nonparticipating Care Provider* violates Section 1 of the Sherman Act (15 U.S.C. § 1), (b) a permanent injunction restraining and enjoining Anthem's implementation of its newly adopted facility administrative policy entitled *Use of a Nonparticipating Care Provider*; (c) damages, in an amount to be determined at trial, to be trebled according to law, to compensate Neurological Surgery for the damages it incurred from Anthem's violations of law; (d) prejudgment interest; and (e) reasonable attorneys' fees and the costs of suit incurred;

2. on the second cause of action, awarding Neurological Surgery (a) a declaration that Anthem's newly adopted facility administrative policy entitled *Use of a Nonparticipating Care Provider* violates the Donnelly Act, New York General Business Law §§ 340 *et seq.*; (b) a permanent injunction restraining and enjoining Anthem's implementation of its newly adopted facility administrative policy entitled *Use of a Nonparticipating Care Provider*; (c) damages, in an amount to be determined at trial, to be trebled according to law, to compensate Neurological Surgery for the damages it incurred from Anthem's violations of law; (d) prejudgment interest; and (e) reasonable attorneys' fees and the costs of suit incurred;

3. on the third cause of action, awarding Neurological Surgery (a) a declaration that Anthem's newly adopted facility administrative policy entitled *Use of a Nonparticipating Care Provider* violates Section 2 of the Sherman Act (15 U.S.C. § 2), (b) a permanent injunction

restraining and enjoining Anthem's implementation of its newly adopted facility administrative policy entitled *Use of a Nonparticipating Care Provider*; (c) damages, in an amount to be determined at trial, to be trebled according to law, to compensate Neurological Surgery for the damages it incurred from Anthem's violations of law; (d) prejudgment interest; and (e) reasonable attorneys' fees and the costs of suit incurred;

4. on the fourth cause of action, awarding Neurological Surgery damages in an amount to be determined at trial, together with pre-judgment interest;

5. on the fifth cause of action, awarding Neurological Surgery damages in an amount to be determined at trial, to be trebled in accordance with law, together with prejudgment interest and reasonable attorney's fees and the costs of suit incurred;

6. on the sixth cause of action, awarding Neurological Surgery (a) a declaration that Anthem's Facility Administrative Policy entitled *Use of a Nonparticipating Care Provider* conflicts with, frustrates, and undermines the operation and purposes of the No Surprises Act, 42 U.S.C. §§ 300gg-111, *et seq.*, as applied to nonparticipating physician services furnished at participating facilities; and (b) a permanent injunction restraining and enjoining Anthem's implementation of its newly adopted facility administrative policy entitled *Use of a Nonparticipating Care Provider*; and

7. such other and further relief that the Court deems just, proper, and equitable including, but not limited to costs (including attorney's fees), disbursements, and other allowances.

Dated: September 16, 2026
Uniondale, New York

HARRIS BEACH MURTHA CULLINA, PLLC.
*Attorneys for Plaintiff*

By ______________________
Roy W. Breitenbach

333 Earle Ovington Boulevard, Suite 901
Uniondale, New York 11553
(516) 880-8378
rbreitenbach@harrisbeachmurtha.com

TO: ELEVANCE HEALTH, INC.
220 Virginia Avenue
Indianapolis, Indiana 46204

Anthem HealthChoice HMO, Inc.
220 Virginia Avenue, Mail Point IN0202 B560,
Indianapolis, Indiana 46204

-

Anthem HealthChoice Assurance, Inc.,
9 Pine Street, 14th Floor
New York, New York 10005.